I ¿THOMAS F. DALEY, Judge.
Appellant, M.F., appeals the granting of the State’s petition to terminate her parental rights to her daughter, S.J.F. On appeal, M.F. argues that the trial court erred in terminating her parental rights for the grounds in Ch.C. art. 1015(6), that she has been sentenced to an extended jail term, when she has been paroled. She also argues that she was not given the requisite legal notice, as required by Ch.C. art. 1015(6).
The record shows that M.F., a forty-two year old woman, is the mother of S.J.F., born on December 5, 1998. S.J.F. was placed into the custody of the Department of Social Services, Office of Community Services (OCS) three times before she was ten months old due to her mother’s repeated incarcerations. At the time of the Termination of Parental Rights trial on March 19, 2001, S.J.F. was twenty-seven months old and had been in OCS custody for nineteen months. At that time, M.F. was incarcerated in the State of Missouri, fulfilling two concurrent sevenj^ear3 sentences for drug possession that were imposed after her probation in that State was revoked as a result of positive drug screens on May 16, 2000 and June 5, 2000.
FACTUAL AND PROCEDURAL BACKGROUND
OCS first became involved with S.J.F. on May 19, 1999, after receiving a report that a five month old baby was found in a filthy residence with her mother and other adults who were arrested for using drugs. M.F. was charged with child desertion, a violation of LSA-R.S. 14:93.2.1, for which she was later convicted and incarcerated in the Jefferson Parish Correctional Center (JPCC). M.F. was also serving a probated sentence from the State of Missouri, for a 1998 conviction for possession with intent to distribute a controlled substance, for which she was on probation at the time. OCS reported that M.F. stated that S.J.F.’s father was unknown and she had no relatives to care for the child while she was in jail. The court granted an Instanter Order and S.J.F. was placed into a dually certified foster home.
At a hearing on May 25,1999, custody of S.J.F. was granted to OCS. The State filed a Child in Need of Care (CINC) Petition pursuant to LSA-Ch.C. art. 606(A)(3). Adjudication was set for July 17, 1999. Meanwhile, S.J.F. remained in foster care until M.F. was released from JPCC and was able to secure housing. Upon the mother’s motion, the court recalled OCS custody and S.J.F. was returned to her mother on July 13, 1999. The CINC adjudication was continued to August 17, 1999.
S.J.F., now seven months old, remained with M.F. approximately one month. On August 16,1999, M.F. was convicted on the charge of child desertion (see above). The next day she was sentenced to six months in jail. OCS was contacted, and learned from M.F. that she had left S.J.F. with a neighbor, M.F. not having made a plan for S.J.F.’s care in the event she returned to jail. At this time M.F. reported to |40CS that S.J.F.’s father was “Manuel” but did not know his last name. No Manuel was ever located.
OCS requested and was granted from the Jefferson Parish Juvenile Court a second Instanter Order for the custody of S.J.F., who was placed back in the home of her former foster parents. The CINC adjudication was held on August 17, 1999. M.F., represented by counsel, stipulated that S.J.F. was a Child in Need of Care. Regarding the second Instanter Order, a custody hearing was held on August 20, 1999. M.F.’s sister appeared and stated *793 that M.F. wanted her to care for S.J.F. while M.F. was incarcerated. The court vacated the August 1999 Instanter Order, thereby returning custody of S.J.F. back to her incarcerated mother, and allowing M.F.’s alternative plan for her child to be cared for by her sister to take effect.
M.F.’s sister, however, did not fulfill her obligations. On September 15, 1999, OCS received a report that S.J.F. was found in a van during a narcotics investigation. The whereabouts of M.F.’s sister were unknown at the time. Marijuana was found in S.J.F.’s diaper. OCS was granted a third Instanter Order for the custody of S.J.F. She was returned to her former foster parents on September 17, 1999, and has remained there since.
M.F. was released from JPCC on October 4, 1999, but was arrested on a traffic stop on November 13, 1999, before she had been able to locate adequate housing for herself and S.J.F. The arrest revealed that she had outstanding warrants from St. Louis, Missouri. M.F. was extradited to Missouri on December 1, 1999. Her probation from the 1998 drug conviction was revoked on January 10, 2000, as a result of her conviction of child desertion in Jefferson Parish. M.F. was sentenced to a 120 day drug treatment program.
|sin November of 1999, M.F. named B.P. of St. Louis, Missouri, as S.J.F.’s biological father. A later paternity test was negative.
M.F. was released on probation on or around May 13, 2000, after completing the 120 day drug treatment program. She returned to the New Orleans area and restarted her case plan for reunification with S.J.F. The record shows that she attended all her supervised visitations with S.J.F. and other counseling sessions. Conditions of M.F.’s probation as well as her OCS case plan prohibited the use of illegal substances. Drug screens performed on M.F. were positive for cocaine on May 16, 2000 and June 5, 2000. On July 11, 2000, Missouri issued a warrant for M.F.’s arrest for this violation of her probation. M.F. was subsequently arrested on or around September 25, 2000, and was extradited to Missouri for the second time on or around October 4, 2000. M.F.’s probation was revoked on October 19, 2000, and her seven year sentence in Missouri was reinstated.
On September 26, 2000, while all parties were present for a CINC review hearing in Juvenile Court, the state filed a Termination of Parental Rights Petition pursuant to LSA-Ch.C. art. 1015(5), alleging M.F.’s lack of compliance with the court approved case plan for services and that there was no reasonable expectation of significant improvement in this forty-two year old mother’s near future. The petition also alleged abandonment by the unknown father, pursuant to LSA-Ch.C. art. 1015(4)(b)(c). M.F., who was incarcerated at JPCC awaiting extradition back to Missouri, was present in court and was served with a copy of the Termination Petition in open court, according to the State’s appellate brief. At this hearing, M.F.’s appointed counsel from the CINC case was appointed to represent her at the termination proceeding. On October 11, 2000, through counsel, M.F. entered a general denial in the answer to the Termination Petition.
IfiOn September 27, 2000, the OCS social worker, Pam Martin, received a call from an O.W., who advised Ms. Martin that he had just learned from M.F. that he was S.J.F.’s biological father and that he wanted custody of his child. Later, while in jail in Missouri, M.F. signed a notarized document dated October 24, 2000, authorizing O.W. and a C.A.W. to have temporary custody of S.J.F. until further notice. A paternity test revealed that he could not *794 be S.J.F.’s father, and he had no further contact with OCS.
On November 9, 2000, the State amended the Termination of Rights Petition to add the grounds authorized under LSA-Ch.C. art. 1015(6), alleging that M.F.’s conviction and sentence rendered her unable to care for S.J.F., and despite notice by OCS, M.F. had presented no reasonable plan to care for the child other than foster care. M.F. was served with a copy of the amended petition through her attorney on November 14, 2000.
On January 22, 2001, OCS dismissed the termination grounds authorized by LSA-Ch.C. art. 1015(5) and elected to proceed solely on the grounds alleged in the November 9, 2000, amendment to the Termination petition: M.F.’s incarceration and failure to provide a viable plan for S.J.F.’s care other than foster care.
Trial on the Termination of Rights Petition was held on March 19, 2001. At trial, the State introduced a certified copy of M.F.’s Missouri probation revocation and seven year sentence. Pam Martin, a social worker with OCS who was M.F.’s case worker, testified that the State served a copy of the Termination Petition on counsel for M .F. at the September 26, 2000, CINC review hearing in Juvenile Court. This same counsel was appointed to represent M.F. in the Termination proceeding. Ms. Martin testified that she had had several conversations with M.F., over the course of her involvement with OCS, wherein Martin told her she needed to submit a[7suitable plan to OCS for S.J.F.’s care while she was incarcerated, and that M.F. never did. Martin admitted that she was the one who, on behalf of S.J.F.’s case staff at OCS, gave the Missouri authorities notice of M.F.’s positive drug screens. Martin testified that M.F. had known, based on conversations they had together, that her probation could be revoked if she tested positive for drugs, and that she also knew that her rights to S.J.F. could be in jeopardy with a positive drug screen. She denied making any recommendation to the Missouri authorities about M.F.’s probation.
Dr. Julie Larrieu, a psychologist with the Infant Team, testified for the State. She said that she supervised the psychology interns who worked directly with S.J.F.’s case. Dr. Larrieu testified that it would not be in S.J.F.’s best interest to be reunited with M.F. She said that M.F. was still struggling with her substance abuse issues, that she was not sensitive to her daughter’s needs, she never took responsibility for S.J.F.’s adjudication as a child in need of care, and that she put her own needs above S.J.F.’s needs. M.F. was unable to see or talk about the effects of her substance abuse on her parenting, and was unable to see the connection between her substance abuse and the effects it had on S.J.F. and her own choices. Further, S.J.F. was a child with special needs; she had expressive language delays and attended a special pre-school program to address it. In her expert opinion, it would be years before M.F. would be able to overcome her own difficulties and be able to care for S.J.F. appropriately.
Dr. Larrieu testified that S.J.F.’s should not be removed from her foster home. She had formed a secure attachment to her foster parents, a bond that Dr. Larrieu termed very important for S.J.F.’s psychological development. She felt that S.J.F. was also already at risk for developing psychological problems due to her multiple placements in OCS custody. Dr. Larrieu also felt that the cards and letters that M.F. sent S.J.F. while in prison could not help build their relationship because they were ls“too abstract” for a child S.J.F.’s age to understand. She testified that *795 S.J.F.’s foster parents were her psychological parents.
Counsel for M.F. proffered certain evidence, including a document from the State of Missouri that indicated M.F. had a parole hearing on February 28, 2001. Another proffered document indicated that M.F. was scheduled for release on “3/00/01.” There was no evidence presented that M.F. had in fact been paroled. She was not present at the hearing because she was still in the State of Missouri, according to her counsel. Likewise, there was no evidence presented that M.F. had complied with the Louisiana case plan for her child’s care, which was a mandatory condition that had to be met prior to her possible release.
After hearing the case, the judge ruled, terminating M.F.’s parental rights and freeing S.J.F. for adoption.
LAW AND ANALYSIS
The State proceeded with its Petition for Termination of Parental Rights under LSA-Ch.C. art. 1015(6), which states:
Art. 1015. Grounds
The grounds for termination of parental rights are:
[[Image here]]
(6) The child is in the custody of the department pursuant to a court order or placement by the parent; the parent has been convicted and sentenced to a period of incarceration of such duration that the parent will not be able to care for the child for an extended period of time, considering the child’s age and his need for a safe, stable, and permanent home; and despite notice by the department, the parent has refused or failed to provide a reasonable plan for the appropriate care of the child other than foster care.
As noted by the trial judge in Reasons for Judgment, this ground contains three portions for proof:
|3a) that the child is in departmental custody pursuant to court order;
b) that the parent has received a sentence of such duration that he will be unable to care for the child for an extended period of time, considering the child’s age and his need for a safe, permanent home; and
c) the parent’s failure to provide an alternate plan for the child’s care, other than foster care, despite departmental notice.
In addition, Ch.C. art. 1036 provides:
E. Under Article 1015(6), a sentence of at least five years of imprisonment raises a presumption of the parent’s inability to care for the child for an extended period of time, although the incarceration of a parent shall not in and of itself be sufficient to deprive a parent of his parental rights.
M.F.’s first issue on appeal is whether a court may terminate the parental rights of an incarcerated parent on the grounds of Ch.C. art. 1015(6), that she has been sentenced to an extended jail term, when that parent has been granted parole. She also argues that the statute does not create an irrebuttable presumption that incarceration means she would be absent from her child’s life for an extended period of time. Though she agrees that her probation was revoked by the State of Missouri to serve her seven year sentence, she argues that the evidence she presented shows that she has been paroled by the State of Missouri. She argues that the State failed to prove that she was not paroled.
The State introduced a certified copy of the record of the proceedings against M.F. in the St. Louis County Circuit Court. M.F. did not challenge this evidence.
*796 The document that M.F. presented in evidence of her parole is dated March 9, 2001, from the State of Missouri Department of Corrections, Board of Probation and Parole. The document notes that there is no minimum mandatory release date. The document states that M.F. has been scheduled for release from confinement on “03/00/01.” It further states that actual release depends upon continued record of hogood conduct and an acceptable release plan. Typed into the bottom of the document is the note: “ * Other — Comply with Louisiana Child Protection Services Plan.”
M.F. presented no other evidence, other than this document, of her “parole” from the custody of the State of Missouri. At trial, M.F. was not present; her attorney admitted that she was still in Missouri. No evidence was presented that M.F. had complied with the Louisiana Child Protection Services Plan as required as a condition of her release. M.F. argues on appeal that the parole date is not the result of an ambiguous projection, it is the result of a firm decision of the Missouri Parole Board to grant M.F. parole and release her from incarceration.
We agree with the trial court that M.F. did not prove that she was actually paroled from the State of Missouri. The evidence is insufficient to show this. The trial court noted and accorded significant weight to the absence of telephone testimony from M.F., or any Missouri probation or parole officer, testimony that was previously approved at a pre-trial status conference. The trial court found that such testimony could have confirmed that M.F. was either already released, or provided the estimated date of her release, plus any detailed conditions of her release. M.F. failed to show that she had been paroled from the State of Missouri. It was not the State’s burden to show that she was NOT paroled from that State’s custody. We agree with the trial court’s conclusion that the State’s evidence shows by clear and convincing evidence that M.F. has been convicted and sentenced to concurrent seven year sentences, • and consequently that M.F. is unable to care for her daughter for an extended period, considering the child’s age and her need for a safe, stable, and permanent home.
M.F. argues next that she failed to receive the statutory notice required by Ch.C. art. 1015. This article provides that “despite notice by the department” the |T1parent has refused or failed to provide a reasonable plan for the appropriate care of the child other than foster care.
M.F. argues that the statute requires notice by the department, not notice by the State as in service of the Petition for Termination of Parental Rights. She argues that the State’s service of this petition at the September 26, 2000 status hearing (as noted by a minute entry in the record), and service of the Amended Petition on her counsel of record on November 13, 2000, are not legally sufficient to notify her that her parental rights could be terminated in the event she failed to produce an alternative care plan for her child. Further, counsel for M.F. argues that she was not served with the Amended Petition as per LSA-Ch.C. art. 1022, which requires that service of a non-resident parent be made by registered mail to the parent, return receipt required, and that service of the Amended Petition was not made in this manner.
Article 1015(6) is not specific in stating what kind of notice to the parent is required. At trial, the State presented the testimony of social worker Pam Martin, who testified that she had been employed on this case since 1999 and had had several conversations with M.F. regarding her need to provide an alternate care plan for *797 S.J.F. or risk termination of her parental rights. M.F. did not testify at the termination proceeding, despite the court’s approval of her telephone testimony from Missouri.
The record shows that M.F. and her appointed counsel were present at the September 26, 2000, CINC review hearing in Juvenile Court and were both personally served with the State’s Petition for Termination of Parental Rights. The witness for OCS at the termination proceeding testified that on the day after the hearing, she received a call from a man named O.W., who stated that he had just learned he could be S.J.F.’s father and he could raise the child. Also, M.F. signed a notarized document dated October 24, 2000, after being served in September with the | ^termination petition, authorizing O.W. and a C.A.W. to have temporary custody of S.J.F. until further notice. The State argues that these acts show that M.F. had the requisite notice from the department that she was required to propose a plan for S.J.F.’s care.
In support of OCS’s arguments, the court noted that a revision of the termination law signified the legislature’s intent with regard to a parent’s notice. LSA-R.S. 13:1601, from the predecessor statute to the Children’s Code, provided in part:
“G. (1) Each person who is incarcerated in a state penal institution in this state shall be given and allowed to keep the following notice within forty-eight hours after incarceration:
“Louisiana law provides that your rights as a parent can be permanently terminated under certain circumstances. When parental rights are terminated, a parent loses all rights to visit, have custody of, or make any decisions or exercise any control over his or her minor child, or children.
Your parental rights may be permanently terminated if, after notice by the Department of Health and Human Resources, you fail to provide a plan for appropriate care for your minor child or children during the period of your incarceration .... ”
R.S. 13:1601 was repealed in 1991. The trial court concluded that because the law no longer required written notice indicated that the legislature intended to allow for such notice to be provided orally.
The trial court further found that the' service of the Amended Petition, upon M.F.’s counsel on November 14, 2000, constituted clear and convincing evidence that M.F. had the requisite definitive notice by the department, almost four months prior to the termination proceeding, that an alternative placement would prevent termination of her parental rights.
lisLSA-Ch.C. art. 1022 states:
If a parent against whom a proceeding is instituted does not reside within this state, service of citation shall be made by registered mail to the address indicated in the petition, return receipt required, not less than five days prior to commencement of the hearing on the matter.
By its plain wording, this statute applies when a proceeding is instituted against a non-resident parent. It does not apply to the service of an Amended Petition. The termination proceeding in this case was instituted on September 26, 2000, when M.F. was still resident in this State. She was present in court and served with the original petition. This argument is without merit.
In conclusion, we find that the State proved by clear and convincing evidence *798 that M.F.’s parental rights should be terminated.
AFFIRMED.